SHARON L. SHEPHERD,          )
          Plaintiff,       )
                   )
     vs.                 )        Civil Action No. 1:14-cv-8
                   )
GANNONDALE,           )
          Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sharon L. Shepherd, brings this action against Defendant, her former employer, Gannondale, alleging claims of religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA), arising out of its alleged refusal to accommodate her beliefs as a Jehovah's Witness and her discharge from employment as a Fiscal Supervisor on June 13, 2013.

Currently pending before the Court for disposition is a motion for summary judgment, filed by Defendant. For the reasons that follow, the motion will be denied.

Facts

Shepherd began working for Gannondale on October 19, 2011. (Sabol Dep. at 16:14-16.)[1] She directly reported to Executive Director Nancy Sabol. (Sabol Dep. at 11:3-5; Shepherd Dep. at 62:3-4.[2]) Shepherd was hired as a "Fiscal Clerk II," and was responsible for completing payroll, accounts receivable, accounts payable, and other bookkeeping functions. (Sabol Dep. at

---

[1] Def.'s App. (ECF No. 19) Ex. C.
[2] ECF No. 19 Ex. A.

15:10-15; Pl.'s App. Ex. 3.[3])

On June 8, 2012, Shepherd was promoted to the position of Bookkeeping Supervisor. (Sabol Dep. at 20:20-23; ECF No. 29 Ex. 4.) On September 12, 2012, Shepherd's title changed to Fiscal Supervisor. The titles were used interchangeably. (ECF No. 29 Ex. 5; Sabol Dep. at 22:9-19.) Her last day of employment with Gannondale was June 13, 2013. (Shepherd Dep. at 83:17-21.)

Gannondale is a non-profit corporation and a ministry of the Sisters of Our Lady of Charity, which provided holistic and therapeutic residential care for young women placed by the court. (Sabol Dep. at 8-9 & Ex. 1; Sabol Decl. ¶ 6.[4]) Nancy Sabol was employed by Gannondale for approximately 30 years and last served as the Executive Director of Gannondale until June 27, 2014. (Sabol. Decl. ¶¶ 2-3; Sabol Dep. at 5-6.) Gannondale ceased all operations on June 30, 2014. (Sabol Dep. at 6-7; Sabol Decl. ¶ 4.) Shepherd's positions did not require her to interact with the young women placed at Gannondale's facilities. (Sabol Dep. at 22:23-23:2.)

Plaintiff has been a practicing member of the Jehovah's Witness faith for more than twenty years. She is a baptized Witness, and attends Congregation meetings two days per week. (Shepherd Dep. at 30-31.) As a Jehovah's Witness, Shepherd does not vote, does not participate in politics, and tries to remain neutral and separate from worldly governments. (Shepherd Dep. at 43:14-20.)

The Sanctuary Model

During its last several years of operation, and prior to Shepherd's employment there, Gannondale had, at the invitation of the Pennsylvania Department of Public Welfare, implemented the "Sanctuary Model of Trauma Informed Care" (the "Sanctuary Model"). (Sabol

---

[3] ECF No. 29.
[4] ECF No. 19 Ex. D.

Dep. at 29-31; Sabol Decl. ¶ 7.)  Gannondale was certified by the Andrus Institute in New York

as a Sanctuary Model organization on March 25, 2011.  (Sabol Dep. at 30-31; Sabol Decl. ¶ 8.)

The Sanctuary Model "represents a theory-based, trauma-informed, evidence-supported,

whole culture approach that has a clear and structured methodology for creating or changing an

organizational culture." http://www.sanctuaryweb.com/sanctuary-model.php  See Sabol Decl.

¶ 9.  Central to the philosophy of the Sanctuary Model is the premise that:

> Trauma-informed change requires a change in the basic mental models upon
> which thought and action is based and without such change, treatment is bound to
> fall unnecessarily short of full recovery or fail entirely. The change in mental
> models must occur on the part of the clients, their families, the staff, and the
> leaders of the organization.

http://www.sanctuaryweb.com/living-philosophy.php  See Sabol Decl. ¶ 10; Sabol Dep. at 49.

Gannondale's website provides that:

> Sanctuary is a clinical and organizational model which recognizes the inherent
> vulnerability of all individuals and social systems to adversity, loss and change.
> According to the Sanctuary Model website (http://www.sanctuaryweb.com/), the
> Sanctuary Model responds with a core belief that every individual and system has
> the capacity to transcend this vulnerability and overcome the impact of these
> potentially traumatic experiences.

(ECF No. 29 Ex. 7.)

Community Meetings

Also central to the Sanctuary Model are "community meetings." These meetings are not

intended merely as a therapeutic tool for clients in a treatment setting, but are also meant to

involve staff and organizational leaders in establishing the "whole organization" implementation

of the Sanctuary Model. http://www.sanctuaryweb.com/community-meetings.php  See Sabol

Dep. at 37, 40 & Ex. 7; Sabol Decl. ¶11.[5]

---

[5] Plaintiff suggests that, because she was an "indirect service provider" (Sabol Dep. at 36:14-
37:4), the Sanctuary Implementation Standards describing community meetings (ECF No. 29 Ex.

Although 100% attendance was not required, all staff members, including office staff, were expected to participate in community meetings whenever possible. (Sabol Dep. at 40; Sabol Decl. ¶ 12.) At community meetings, participants were asked three questions:

a. How are you feeling?
b. What is your goal for the day?
c. Who can help you achieve that goal?

(Sabol Dep. at 37-38; Shepherd Dep. at 27; Ehrensberger Dep. at 7-8;[6] Sabol Decl. ¶ 13.) In the context of community meetings for office staff, such as Shepherd, these questions were typically asked of employees by a coworker. (Sabol Dep. at 39, 43; Sabol Decl. ¶14.) In Gannondale's administration building, where Shepherd worked, community meetings were held four days per week. (Sabol Dep. at 38:18-39:15.)

Gannondale states that there was no "right" or "wrong" answer to these questions. (Sabol Dep. at 45-48, 96-97; Ehrensberger Dep. at 30-33; Sabol Decl. ¶15.) Answers were not written down, recorded, or graded. (Sabol Decl. ¶ 16.) No employee was told what to say, although employees were sometimes encouraged to relate their answer to one of the "Seven Commitments" of the Sanctuary Model. (Sabol Dep. at 45-48, 96-97; Ehrensberger Dep. at 30-33; Sabol Decl. ¶ 17.) Gannondale states that there was no discipline or punishment for not answering a question, or for answering (or not answering) a question in a particular way. (Sabol Dep. at 45-48, 96-97; Ehrensberger Dep. at 30-33; Schumacher Dep. at 12-13;[7] Sabol Decl. ¶ 18.)

---

8 at 104, 380) did not apply to her. However, Defendant responds that she has taken these excerpts out of context. More importantly, the employer determines what its employees' job requirements are, so even if the Sanctuary Model itself did not state that all employees must attend community meetings, Gannondale could modify the Sanctuary Model to impose that requirement.

[6] ECF No. 19 Ex. G.

[7] ECF No. 19 Ex. H.

Plaintiff responds that, in the Fall of 2012, Director of Mission and Ministry Pearl Jeffries began directing that the "feeling" and "goal" must be tied to the monthly commitment. She corrected employees for stating an incorrect goal, and had them restate the goal. (Shepherd Dep. at 49:14-20; Shepherd Decl. ¶ 3.[8]) Plaintiff notes that, while employees were not told explicitly what to say, their answers did need to fit within those parameters. (Shepherd Decl. ¶¶ 2-3.) She states that no one ever gave her the option of attending community meetings without participating in them. (Shepherd Dep. at 104:11-16; Yaple Dep. at 28:24-29:2.)

Sabol admitted that Shepherd's job descriptions made no reference to the Sanctuary Model or community meetings and that Shepherd could perform her job duties as listed on the job description without attending the meetings. (Sabol Dep. at 49:7-18.) However, Sabol stated that the purpose of "community meetings" was to "build community" and "to help people become more attuned to their feelings." (Sabol Dep. at 40:12-23.) Gannondale states that not attending community meetings in some form or fashion would limit an employee's participation in the Sanctuary Model as a whole, as well as participation in the organization that was Gannondale. (Sabol Dep. at 49-51; Sabol Decl. ¶ 19.)

Sabol could not identify any documents explaining what a "community meeting" is, and did not know whether Gannondale ever gave its employees any documents explaining community meetings. (Sabol Dep. at 37:24-38:1, 39:23-25.) Plaintiff notes that Gannondale produced no documents in discovery explaining what a "community meeting" is; why attendance is important; how often they must occur; or even identifying the three questions "how are you feeling?," "what is your goal for the day?," and "who could help you achieve that goal?" as being part of the Sanctuary Model.

---

[8] ECF No. 29 Ex. 9.

According to Sabol, the goal stated by the employee at a community meeting should not be "task-related." For example, an employee should not give a goal such as "I'm going to get my paperwork done," or "I'm going to reconcile all the accounts receivable today." (Sabol Dep. at 46:4-24.)

The Seven Commitments are:

a. a commitment to nonviolence;
b. a commitment to emotional intelligence;
c. a commitment to social learning;
d. a commitment to open communication;
e. a commitment to democracy;
f. a commitment to social responsibility; and
g. a commitment to growth and change.

http://www.sanctuaryweb.com/commitments.php See Sabol Decl. ¶ 20; Sabol Dep. at 34; Shepherd Dep. at 28-29 & Ex. 1.

The Seven Commitments are the pillars of the Sanctuary Model, and are essential to its implementation. Sabol stated that they are not simply intended for clients in treatment. "The Seven Commitments apply to everyone. Organizational leaders must be fully committed to the process of the Sanctuary Model for it to be effective – that means the Board of Directors, Managers and Staff. If the organizational leaders do not get on-board, it will not work." http://www.sanctuaryweb.com/commitments.php See Shepherd Dep. Ex. 1; Sabol Decl. ¶¶ 21-22.

Defendant states that Shepherd received training on the Sanctuary Model when she began employment at Gannondale, and received additional training at various times after that. (Shepherd Dep. at 26-27; Sabol Decl. ¶ 23 ECF No. 31 Ex. K at 29-31.) Plaintiff responds that, while she received training on the Sanctuary Model in general, she never received training on community meetings. (Shepherd Dep. at 26:10-16, 24-27:4, 45:14-21; Shepherd Decl. ¶ 1.)

Sabol states that the Sanctuary Model and the seven commitments are also discussed in Gannondale's Employee Handbook which was provided to Shepherd at the time of her hire. (Sabol Decl. ¶ 24 ECF No. 31 Ex. K at 1-2.) Plaintiff notes that The Handbook contains the following paragraph on the Sanctuary Model:

> Gannondale employs the Sanctuary Model of Organizational Development. To that end, we strive to live up to the following commitments: nonviolence, open communication, social learning, social responsibility, emotional intelligence, shared governance and growth and change. Residents, staff, administration and the Board of Trustees work together to create a safe environment, where past traumas can be healed.

(Gannondale Employee Handbook at 5.)[9] She notes that The Handbook contains no other reference to the Sanctuary Model, and contains no reference to community meetings.

Shepherd attended community meetings, without objection, for approximately a year. (Shepherd Dep. at 27-28, 60; Sabol Dep. at 43; Schumacher Dep. at 11-12; Sabol Decl. ¶ 26.) She set goals for herself and, as a supervisor, helped other employees set goals and evaluated them on their ability to attain those goals. (Shepherd Dep. at 59; Sabol Dep. at 42, 49-50; Sabol Decl. ¶ 25.)

Defendant indicates that, beyond community meetings, Shepherd also participated in various activities, trainings, and meetings that involved various aspects of the Sanctuary Model. (Sabol Dep. at 51-52; Sabol Decl. ¶ 26.) Plaintiff notes that these were "team meetings" which did not focus on a monthly commitment to the Sanctuary Model. (Sabol Dep. at 51:5-52:12.)

Plaintiff Stops Attending Community Meetings

In the Fall of 2012, Gannondale's Director of Mission and Ministry, Pearl Jeffries, directed the employees to focus on a different "commitment" of the Sanctuary Model each month, and required that the goal stated at the community meeting relate to that particular

---

[9] ECF No. 29 Ex. 21.

"commitment." (Shepherd Dep. at 49:14-22; Shepherd Decl. ¶ 2.) Plaintiff states that employees were handed a page on the "commitments" every month in advance so they could study it and be prepared for the meetings. (Shepherd Dep. at 50:7-12.) When the community meetings were first implemented, there was no focus on a monthly commitment. (Sabol Dep. at 44:15-17.) Sabol admitted that the focus on the monthly commitment was not required by the Sanctuary Model itself. (Sabol Dep. at 45:12-15.)

Plaintiff contends that, if an employee stated a goal that did not relate sufficiently to the "commitment," Gannondale's managers would correct that employee and require him or her to restate the goal. (Shepherd Decl. ¶ 3.) Defendant responds that employees were encouraged to state a goal in relation to a commitment, but it was not a requirement. (Sabol Dep. at 45:16-21.)

Plaintiff states that, prior to the introduction of the "commitments" in the Fall of 2012, no one had explained the Sanctuary Model to her in full. Once the "commitments" became part of the "community meetings," she looked into the Sanctuary Model and believed there was too much anti-Christian content for her to be a part of the "community meetings." (Shepherd Dep. at 45:14-21.)

Shepherd learned that the Sanctuary Model references religious leaders and adulterers, such as Buddha, Martin Luther King, and Gandhi.[10] Shepherd, on the other hand, believes in the Bible and in God's word, rather than the words of those individuals. (Shepherd Dep. at 38:2-13.) Shepherd did not feel comfortable with the Sanctuary Model because it relies on governments and other religions. (Shepherd Dep. at 41:12-15.)

Shepherd received a paper from Gannondale on "growth and change," which stated something along the lines that individuals can change society and culture through their actions.

---

[10] In her filings, Plaintiff uses the word "idolaters," but at her deposition, the word recorded was "adulterers."

(Shepherd Dep. at 50:18-22.)  She testified that these ideas contradict her faith because she believes that Armageddon is coming, and there is nothing anyone can do to stop judgment day from taking place. (Shepherd Dep. at 32:21-24.)  Plaintiff states that:

> Most of the seven "commitments" violate my religious beliefs because they focus on the idea of changing the future through individual and group actions.  While I believe humans can grow and change on a personal level, I believe the outcome of the world has already been decided.  Jesus has directed that we be no part of the world and not be part of worldly governments.  I view the "community meeting" as a worldly government because it follows an organized system of ideals and focuses on changing the future through collective actions.

(Shepherd Decl. ¶ 5.)

Defendant responds that Shepherd testified that an individual's destiny is not predetermined and that the concepts of "growth and change" do not contradict the tenets of the Jehovah's Witness faith (Shepherd Dep. at 31-33, 35-38), and she also acknowledged that it is possible for groups of like-minded individuals to have an effect on a culture or society, at least if they are Jehovah's Witnesses. (Shepherd Dep. at 51-52.)  She has also acknowledged that the Sanctuary Model is focused on individual conduct and individual outcomes, and not the end of the world. (Shepherd Dep. at 36-37, 80.)

Plaintiff contends that the Sanctuary Model relies on the teachings of Maxwell Jones, "who most enthusiastically developed the concepts of the therapeutic community both in Britain and in the United States and attempted to spread those concepts to institutions outside of the formal psychiatric system."  (ECF No. 29 Ex. 10.)  In its explanation of "growth and change," the Sanctuary Model quoted Maxwell Jones, who stated: "Who knows what directions society must take in order to protect itself from extinction? In any case these global problems are the concern of rational governments. Behind these valid rationalizations lurks the most basic problem of all – man's almost universal resistance to change as an ongoing process." (ECF No.

29 Ex. 11.)  She notes that Sabol admitted that the above statement by Jones sounded in conflict with what Shepherd told her about her religion. (Sabol Dep. at 78:21-79:2.)

The Sanctuary Model's commitment to "emotional intelligence" explains, in part: "because we are a social species, dependent for our survival on other people from the time we are born, evolution designed us to resonate with the emotions of other." (ECF No. 29 Ex. 12.) This statement conflicts with Shepherd's religious beliefs because she does not believe in evolution.  (Shepherd Dep. at 42:10-24.)

Shepherd disagrees with the Sanctuary Model in general because it is an organized set of beliefs and ideals that differ from the Bible, and she believes in what the Bible says. (Shepherd Dep. at 36:16-20.)  Shepherd does not feel comfortable with the Sanctuary Model because it does not refer to or rely upon the teachings of the Bible. (Shepherd Dep. at 41:6-9.)

Shepherd explains that she did not seek to require Gannondale to abandon the Sanctuary Model.  Instead, she believed she could be accommodated by being excused from the "community meetings." (Shepherd Dep. at 46:11-47:16.)  In response, Defendant questions whether, based upon Plaintiff's deposition testimony about the Sanctuary Model, she would have been satisfied with anything short of Gannondale abandoning the Sanctuary Model.

In the early Fall of 2012, Shepherd approached Human Resources Manager Brenda Yaple and said she could no longer attend community meetings because "I have my own religion." (Shepherd Dep. at 60:12-61:3, 63:16-22; Shepherd Decl. ¶¶ 2, 4.)  In response, Yaple stated, "I know." She then told Shepherd if the meetings conflicted with her religious beliefs, she absolutely did not have to attend them. (Shepherd Dep. at 61:8-12.) After speaking with Yaple, Shepherd stopped attending community meetings. (Shepherd Dep. at 60:12-25.)[11]  Yaple took no

---

[11] Defendant contends that this occurred sometime between November 2012 and January 2013.

action in response to Shepherd not attending community meetings. (Yaple Dep. at 24:12-19.)[12] Defendant points out that Shepherd did not discuss the matter with her direct supervisor, Nancy Sabol, Gannondale's Executive Director, until May 23, 2013. (Shepherd Dep. at 62, 68; Sabol Decl. ¶ 28.) However, the record reflects that Sabol knew about Shepherd not attending community meetings long before that date and took no action.

Defendant notes that, after Shepherd stopped attending community meetings, she continued to attend and participate in "team meetings." Sabol described the "team meeting" as a shortened version of the "community meeting" with a "feelings check-in," where coworkers ask each other the same three questions asked at a community meeting. (Sabol Dep. at 52:4-6.) "Team meetings," however, did not focus on the monthly "commitment," while community meetings did. (Sabol Dep. at 52:7-12.)

<u>Conversations with Stacey Green Ehrensberger</u>

On or about April 3, 2013, Gannondale held a meeting with the employees in the administration building. During that meeting, Shepherd raised some concerns about other employees. Sabol then opened the meeting for others to respond to Shepherd. In response, Associate Director Stacey Green Ehrensberger raised a concern regarding Shepherd not participating in the Sanctuary Model by attending community meetings. (Ehrensberger Dep. at 9:22-10:1, 10:14-11:4, 12:1-3; Shepherd Dep. at 67:4-10.) Ehrensberger did not supervise Shepherd. (Ehrensberger Dep. at 6:17-20.)

Neither Shepherd nor anyone else present at the meeting said anything in response to

---

(Sabol Dep. at 52-53; Sabol Decl. ¶ 27.) However, because this fact is disputed, Plaintiff's version must be taken as true at this stage of the proceedings. Moreover, it is noted that in Defendant's position statement with the EEOC, it indicated that she stopped attending meetings in October or November 2012. (ECF No. 29 Ex. 22 at 3.)
[12] ECF No. 29 Ex. 6.

these concerns about Shepherd not participating in community meetings. (Ehrensberger Dep. at 11:13-22.)  Ehrensberger then sent Shepherd an email asking to follow up with her about her comment regarding Shepherd not attending community meetings. (ECF No. 29 Ex. 14 at 3, 4); Ehrensberger Dep. at 11:23-25.)

Shepherd agreed to meet with Ehrensberger, but wanted Yaple to be present because she wanted a Human Resources person there if they were going to discuss the issue of her not attending community meetings. (ECF No. 29 Ex. 14 at 2, 4.) The meeting between Shepherd, Ehrensberger, and Yaple never occurred, allegedly due to conflicting schedules. (Ehrensberger Dep. at 12:8-15.)  Later, Ehrensberger told Shepherd not to worry about the community meetings issue, and she had forgotten about it. (Shepherd Dep. at 67:22-24.)

On May 22, 2013, during an unrelated conversation about time sheet issues, Shepherd told Ehrensberger she was not attending community meetings because it was against her religious beliefs.  Ehrensberger told Shepherd she needed to talk to Sabol about that. (Shepherd Dep. at 66:12-23, 67:12-14, 67:25-68:3.)

The May 23, 2013 Meeting

On May 23, 2013, Shepherd requested additional time following a regularly scheduled bookkeeping meeting with Sabol to discuss several issues relating to Shepherd's employment with Gannondale.  Sabol agreed to this request.  (Shepherd Dep. at 68; Sabol Dep. at 56; Sabol Decl. ¶ 29.)  After the bookkeeping portion of the meeting concluded, Shepherd asked if Yaple could be present, and Yaple attended the remainder of the meeting.  (Sabol Dep. at 56:23-57:6.)

During the course of their May 23, 2013 conversation, Sabol learned for the first time that Shepherd was a Jehovah's Witness and that she claimed that community meetings and the Sanctuary Model's commitment to growth and change conflicted with her religious beliefs as a

Jehovah's Witness.  According to Gannondale:

> a. Shepherd then shared the conversation that she had with Ehrensberger and asked whether Sabol wanted her to remain employed at Gannondale.

> b. Sabol and Shepherd then had a frank discussion regarding issues that had arisen throughout Shepherd's employment as well as Shepherd's role within the organizational structure and the roles of other administrators.

> c. Eventually, the issue of the community meetings came up.

> d. After Shepherd offered several observations on the program, Sabol reminded her that the Sanctuary Model was an organizational model for all members of the community, including staff, administrators, and children, and that attendance at the meetings, when available, was mandatory as part of the model.

> e. In response, Shepherd argued that attendance at the meetings infringed upon her religious beliefs.

> f. Specifically, Shepherd indicated that she did not feel she should have to give a goal related to commitments.

> g. Sabol explained that this was an organizational tool to help employees further integrate the commitments into Gannondale's culture.

> h. Sabol asked Shepherd to explain how community meetings and the commitment to growth and change supposedly conflicted with her religious beliefs.

> i. Shepherd expressed that she did not believe in shared governance (democracy) because she does not vote. Sabol again attempted to explain the organizational model and philosophy and that she could not excuse Shepherd's outright refusal to participate in the community meetings.

> j. At that point, Shepherd asked if Sabol was firing her.

> k. Sabol advised Shepherd that attendance at the community meeting was an expectation, as was participation in the Sanctuary Model. If she would not participate, Shepherd was advised that she should seek employment at a place where the philosophy was more suited to her.

(Shepherd Dep. at 68-69; Sabol Dep. at 57-59, 62-71 & Ex. 8; Sabol Decl. ¶ 30.)

Defendant notes that no other employee of Gannondale was ever permanently excused

from attending community meetings.  (Shepherd Dep. at 48-49; Sabol Dep. at 89-95; Sabol Decl.

¶ 38.)  To the contrary, employees who did not attend community meetings, or missed a significant number of them, were counseled on the importance of attendance in their annual evaluations.  (Shepherd Dep. at 48-49; Sabol Dep. at 89-95 & Exs. 13-14; Sabol Decl. ¶ 39.)

Plaintiff explains that, during the meeting, she brought up the issue of community meetings because she did not want dissension with Ehrensberger, and because she wanted to let Sabol know that she was not attending because they conflicted with her religious beliefs. (Shepherd Dep. at 68:16-23.)  According to Yaple, the "gist" of the conversation at the May 23 meeting was that employees had to attend community meetings to be employed by Gannondale. (Yaple Dep. at 29:3-9.)  Shepherd objected to stating daily goals aligned with the seven commitments. (Yaple Dep. at 30:16-18.)  Plaintiff notes that Sabol did not disagree that Shepherd was required to state a daily goal aligned with the monthly "commitment," and did not tell Shepherd that she was not required to state a goal aligned with the "commitments." (Sabol Dep. at 68:14-23.)

Shepherd also explained that Yaple had previously told her that she did not have to attend community meetings if they conflicted with her religious beliefs, but Yaple denied saying that. (Shepherd Dep. at 68:24-69:5.)  Shepherd states that Sabol made clear that she was Shepherd's supervisor, and Yaple was not. (Shepherd Decl. ¶ 6.)

During that meeting, Sabol learned for the first time that Shepherd was a Jehovah's Witness. (Sabol Dep. at 55:12-21.)  Prior to the May 23 meeting, Sabol had never told Shepherd that community meetings were mandatory.  Sabol instead assumed that was "understood" as part of Gannondale's "culture." (Sabol Dep. at 67:19-23.)

Shepherd explained that the "shared governance" commitment conflicted with her religious beliefs, because Jesus asked that his followers be no part of the world. (Shepherd Dep.

at 69:6-7.)  Sabol indicated that Shepherd did not explain the conflict.  (Sabol Dep. at 58-59, 62-65.)  Shepherd further explained that she does not vote and does not believe in shared governance. (Sabol Dep. at 58:9-15.)

Plaintiff contends that Sabol responded that she did not believe Shepherd's religious objection was relevant, and that if she could not participate in the community meetings, she was not a part of Gannondale. (Shepherd Dep. at 69:8-10.)  Defendant responds that Sabol was trying to understand the conflict and to explain that she could not simply grant Shepherd a blanket exemption from participating in community meetings.  (Sabol Dep. at 58-59, 62-65.)

Shepherd then asked Sabol if she was letting her go. (Shepherd Dep. at 69:11-12.) In response, Sabol told Shepherd she could resign. Shepherd responded that she would not resign, because she had not done anything wrong. (Shepherd Dep. at 69:13-14.)

Yaple disagreed that the community meetings conflicted with Shepherd's religion. Shepherd asked what Yaple knew about her religion. Yaple responded, "nothing," and put her head down. (Shepherd Dep. at 69:15-19.)

By the time the meeting ended, Sabol and Shepherd had reached an impasse, and Shepherd could no longer be an employee at Gannondale. (Sabol Dep. at 64:15-19.)  Sabol gave Shepherd the options of leaving right then, tendering a notice, or staying until a replacement was hired. (Sabol Dep. at 65:2-10.)

The "Employment Agreement"

About 15 minutes later, Yaple presented Shepherd with an "employment agreement." (Shepherd Dep. at 70:3-9.) According to Sabol, the purpose of the "employment agreement" was to clarify for Shepherd the conclusion of the meeting and her options moving forward. (Sabol Dep. at 72:7-10.)  The document stated as follows:

On May 23, 2013, Nancy Sabol, Executive Director, Sharon Shepherd, Bookkeeping Supervisor, and Brenda Yaple, Human Resources Manager[,] met to discuss Sharon's employment at Gannondale. Sharon stated that attending daily community meetings and establishing daily goals aligned with the seven commitments is against her religious beliefs. Gannondale embraces the Sanctuary Model of Organizational Change and became a certified Sanctuary Agency on March 25, 2011. Gannondale does not in any way view this as religious and participation is a part of employment.

Sharon's participation in community meetings will not be waived. She was offered a clarified job description but stated she still would not attend the meetings or sign the new job description. In order to affect a mutually agreeable departure and afford Sharon time to find suitable employment, the following is agreed upon: Sharon may actively seek employment, and if necessary, can arrange interviews during work hours with prior discussion/approval from the Executive Director. Sharon's position will be advertised, and Sharon is asked, while she remains an employee, to participate fully in training her replacement. Gannondale would request a two week notice prior to Sharon's departure. In the event Sharon does not obtain employment her position would be terminated 30 days subsequent to her replacement beginning work. Sharon will be eligible for all earned vacation and holiday time provided we get proper notice of her departure.

(ECF No. 29 Ex. 15.) At the bottom of the form, Yaple hand wrote that "Sharon refused to sign because we would not state that we would not dispute her employment compensation." (Yaple Dep. at 30:22-31:6.)

The Email Announcement and Job Posting

Later that day, Sabol directed Yaple to send an email announcing to all staff that Shepherd "will be leaving our employment, though a date has not yet been determined. It is our intention to open her position for application, and Sharon will be helping to train her replacement." (Yaple Dep. at 34:11-24; ECF No. 29 Ex. 16.) Sabol states that this action was taken because Shepherd had already told another staff member and they did not want the information to come out that way. (Sabol Dep. at 74.) The next day, May 24, 2013, Yaple posted Shepherd's job to the public. (Yaple Dep. at 33:14-20; ECF No. 29 Ex. 17.)

Follow Up

On June 2, 2013, after Sabol returned from vacation, Shepherd gave her a letter stating:

> On May 23, 2013 during my bookkeeping meeting at Gannondale, you informed me, with your HR manager present, that my employment will be terminated on the basis that I am unable to attend the community meetings. This very same HR Manager told me if it conflicts with my religion, I don't have to attend them.
>
> You have announced to the Facility that I am leaving, posted my position available on at least 2 web sites and are currently interviewing applicants. When another person is hired to fill my position, I will consider myself unemployed and await my due wages and earned leave with the next scheduled payroll processing.

(ECF No. 29 Ex.18; Shepherd Dep. at 75:8-20.)

Sabol then asked Shepherd to produce "proof" that "growth and change" conflicted with her religious beliefs. (Shepherd Dep. at 75:21-24.)  Later, Shepherd gave Sabol a document that quoted parts of the Sanctuary Model's explanation of "growth and change," as well as a short explanation of her beliefs. (ECF No. 29 Ex. 19; Sabol Decl. ¶¶ 31-32.)

Specifically, Shepherd noted that the Sanctuary Model "has a clear and structured methodology for creating or changing an organizational culture," and "to practice Sanctuary, formal and informal leaders must manage from the future, instilling, inspiring and modeling a vision of hope and possibility, and push a system and everyone in it toward a disequilibrium state that promotes the possibility of creative change."  (ECF No. 29 Ex. 19.)  On the other hand, the Bible teaches that "peace on Earth will come not through human efforts, but by means of God's Kingdom, a heavenly government ruled by Jesus Christ." She further explained that "as a world government, [God's Kingdom] will eliminate nationalism, which is at the root of many conflicts."  Id.

In response, Sabol said she still did not understand the conflict between the Sanctuary Model and Shepherd's religious beliefs. (Sabol Dep. at 75:14-19.)  Shepherd then brought up the issue of Armageddon, explaining that we are not "of the world," and that only God will decide

the outcome. Shepherd explained that this idea conflicted with "growth and change," from the perspective the outcome had already been decided. (Sabol Dep. at 76:4-6.)

Further Discussions with Yaple

Shepherd testified that, after these events, Yaple tried to talk her out of resigning many times, telling her she could just come to the meetings, asking what the big deal was, and telling her to just "suck it up." (Shepherd Dep. at 70:21-71:6, 72:5-10.) She also states that Yaple told her that community meetings no longer required employees to tie a goal to a specific commitment, but Sabol never indicated that; rather, Sabol had made clear that she, not Yaple, was Shepherd's supervisor. In addition, Plaintiff's position had been posted and her departure had been announced. (Shepherd Decl. ¶ 6.)[13]

Sabol never offered to allow Shepherd not to tie her goal to the monthly commitment, and Yaple did not say that direction came from Sabol. (Shepherd Decl. ¶ 7.) Plaintiff further states that:

> [B]y the time I talked to Ms. Yaple in late May or early June 2013 about tying the goal to the monthly "commitment," I understood that each "community meeting" would still focus on a "commitment." Focusing on those "commitments" was against my religious beliefs, regardless of whether I would be required to state a goal related to them.

(Shepherd Decl. ¶ 8.) Shepherd states that no one ever gave her the option of attending community meetings without participating in them. (Shepherd Dep. at 104:11-16; Yaple Dep. at 28:24-29:2.)

On June 17, 2013, Shepherd's replacement began work for Gannondale. (Def.'s Answer Pl.'s Interrog. No. 50.)[14] The previous week, Yaple told Sabol that a replacement had been

---

[13] Yaple, on the other hand, claimed to have no recollection of ever speaking to Shepherd about community meetings or her religious beliefs after May 23, 2013. (Yaple Dep. at 43:11-14.)
[14] ECF No. 29 Ex. 20.

hired. (Yaple Dep. at 36:12-37:2.)  Shepherd's last day with Gannondale was June 13, 2013. (Shepherd Dep. at 83:17-21.)

Defendant states that, after the decision was made that a replacement for Shepherd would be sought, Shepherd was advised that she was welcome to stay on for a period of 30 days after her replacement had been hired.  (Sabol Decl. ¶ 40.)  Plaintiff responds that Defendant offered to allow her to stay for a period of 30 days if she signed the "employment agreement." Shepherd did not sign that agreement because Defendant would not agree not to contest her right to unemployment compensation. (ECF No. 29 Ex. 19; Yaple Dep. at 30:22-31:6.)  She notes that there is no record evidence that the offer to allow her to work for an additional 30 days was still an active offer absent her signing of the "employment agreement."

Defendant states that, the day that Shepherd's replacement was hired, June 13, 2013, she quit her position with Gannondale.  (Sabol Dep. at 52; Sabol Decl. ¶ 41.)  Plaintiff responds that she did not "quit" her employment.  Rather, Defendant discharged her on May 23, 2013, when Sabol determined they had reached an impasse and Shepherd could not continue to be an employee at Gannondale. (Sabol Dep. at 64:15-19.)  That day, Defendant announced that Shepherd would be leaving employment. (ECF No. 29 Ex. 16.) The next day, Defendant advertised an opening for Shepherd's position. (Yaple Dep. at 33:14-20; ECF No. 29 Ex. 17.) On June 2, 2013, Shepherd notified Sabol that when another person was hired to fill her position, she would consider herself unemployed. (ECF No. 29 Ex. 18.)

Procedural History

On June 23, 2013, Shepherd executed a Charge of Discrimination against Gannondale before the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. (Shepherd Dep. Ex. 2.)

Plaintiff filed this action on January 17, 2014 and she filed an Amended Complaint on July 3, 2014. Count I alleges religious discrimination in violation of Title VII, both for failing to accommodate her sincerely held beliefs and for firing her because of them. Count II alleges that Defendant's act of firing based on her religion violated the PHRA.

On October 9, 2014, Defendant filed a motion for summary judgment (ECF No. 18). On November 4, 2014, Plaintiff filed her brief in opposition (ECF No. 26). On November 18, 2014, Defendant filed a reply brief (ECF No. 30).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

favor. <u>Hugh v. Butler County Family YMCA</u>, 418 F.3d 265, 266 (3d Cir. 2005); <u>Doe v. County of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001). As noted above, the Court is required to liberally construe pro se filings, <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).

Defendant argues that: 1) Plaintiff cannot establish a prima facie case of religious accommodation discrimination because she fails to articulate a sincere religious belief that conflicts with a job requirement; 2) even if she established a prima facie case, her proposed accommodation—to be excused entirely from attending community meetings—was not reasonable and she was not even willing to consider alternatives; and 3) she cannot establish a prima facie case of disparate treatment based on her religious beliefs because her proposed comparator was not granted a blanket exception from attending community meetings but rather was counseled about missing a significant number of meetings, after which his attendance improved.

Plaintiff responds that: 1) a reasonable jury could find that her sincerely held religious beliefs conflicted with Gannondale's community meetings and that she informed her employer of the conflict; 2) Defendant cites no support for the argument that Plaintiff's proposed accommodation was per se unreasonable and it offered no alternatives (and to the extent it did, the offer was made after the adverse actions occurred, is disputed, came from someone other than Plaintiff's supervisor, was stated in passing and would not have eliminated the conflict); 3) Defendant has not demonstrated that it would have incurred an undue hardship (which it couches in terms of a reasonable accommodation) by excusing her from community meetings, because undue hardship requires the employer to bear more than a de minimis cost and Defendant waited six months after she stopped attending community meetings to take any action (and Plaintiff had no job performance issues); and 4) she does not have to point to a similarly situated individual to

establish a prima facie case of disparate treatment and a jury could conclude that she was discharged under circumstances which give rise to an inference of unlawful discrimination.

In a reply brief, Defendant argues that: 1) Plaintiff fails to acknowledge that her own sworn testimony flatly contradicts her pleadings and disproves her prima facie case; 2) she was not fired for failing to attend community meetings, but she would have been fired (had she not quit) for refusing to accept any possible solution to her objection to attending community meetings other than a blanket exception; 3) Gannondale made a good-faith effort to accommodate Plaintiff, by trying to understand her objections and to engage in a dialogue with her about whether a conflict actually existed and it has satisfied its burden (which is not a heavy one) to demonstrate that Plaintiff's accommodation would have imposed an undue hardship.

Title VII Standards

Title VII provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of her religion. 42 U.S.C. § 2000e-2(a). The PHRA similarly prohibits such discrimination. 43 P.S. § 955(a). Title VII also indicates that:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j). "The intent and effect of this definition was to make it an unlawful employment practice under § 703(a)(1) for employer not to make reasonable accommodations, short of hardship, for the religious practices of his employees and prospective employees." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 74 (1977). As the Court of Appeals has observed, "employees may assert two theories of religious discrimination: 'disparate treatment'

22

… and 'failure to accommodate.'" Abramson v. William Paterson College of N.J., 260 F.3d 265, 281 (3d Cir. 2001) (footnote omitted).  Plaintiff advances both theories in this case.

Disparate Treatment

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of disparate treatment indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981).  Abramson, 260 F.3d at 281.

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court.  It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals for the Third Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered  legitimate  reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action  (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Defendant argues that "It was not Shepherd's religion that led to her difficulties, but rather her refusal to even consider any resolution of the matter short of what she demanded." (ECF No. 30 at 5.)  In other words, it appears to be arguing that Plaintiff was not fired "because of" her religious beliefs, but because of her refusal to attend community meetings (which was based on the conflict with her religious beliefs).  As other courts have held when presented with this kind of argument, it is sophistry.  See Adeyeye v. Heartland Sweeteners, LLC, 721 F.3d 444, 454 (7th Cir. 2013) (rejecting argument that the plaintiff was not fired because of a dispute over the accommodation of his religious beliefs, but because he left for Nigeria to participate in funeral rites for his father, which he did because of his sincerely held religious beliefs). Shepherd informed Sabol on May 23, 2013 that she was a Jehovah's Witness and that attending community meetings conflicted with her sincerely held religious beliefs and by the end of that meeting she no longer had a job at Gannondale.  Thus, she has stated a prima facie case of disparate treatment.

Defendant also appears to argue that Plaintiff was not terminated: "What would have eventually led to her termination (had she not quit) was her stated refusal to consider any possible solution to her objection to attending community meetings other than a blanket exemption from participating in that aspect of the Sanctuary Model." (ECF No. 30 at 3.)[15]  In addition to the fact that this argument ignores the dictates of Title VII (as explained below) and the record by suggesting that it was Plaintiff's obligation to come up with an accommodation that was satisfactory to Gannondale, this argument also misconstrues the law concerning constructive discharge.  An employee can "establish a claim for constructive discharge when an employer acts in a manner so as to have communicated to a reasonable employee that she will be

[15] This argument first appears in Defendant's reply brief, although the factual statement is contained in its Concise Statement of Material Facts Not in Dispute (ECF No. 19 ¶ 46).

terminated, and the plaintiff employee resigns." Matos v. PNC Financial Servs. Group, 2005 WL 2656675, at *4 (D.N.J. Oct. 17, 2005) (citations omitted). In Matos, the plaintiff's immediate supervisor told her she would be fired if she went to a convention and the bank manager told her she had to choose between her work and her God.

Similarly, Shepherd has testified that on May 23, 2013, she was told by Sabol that if she could not participate in community meetings, she was not part of Gannondale; that she asked Sabol if she was being let go and Sabol told her she should resign but Shepherd refused; and that Sabol gave Shepherd the options of leaving right then, tendering her notice or staying until a replacement was hired. Following this meeting, Sabol had a message sent out that Shepherd was leaving, posted her job and hired a replacement for her. In addition, the "employment agreement" that Gannondale prepared stated that Plaintiff would be terminated 30 days after her replacement started. Under these circumstances, a reasonable jury could conclude that Sabol either terminated Shepherd on May 23, 2013 or communicated to her that she would be terminated once her replacement was hired and then she resigned on June 13, 2013 just before she would have been terminated. In other words, the record is sufficient to support a claim that Shepherd was subjected to an adverse employment action in the form of a termination or a constructive discharge.

To summarize, at a meeting on May 23, 2013, Sabol found out that Plaintiff was a Jehovah's Witness and that she had a religious belief that conflicted with the requirement to attend and participate in community meetings, specifically to stating goals related to the seven commitments of the Sanctuary Model. Sabol stated that she did not understand the conflict and would not allow Plaintiff to be excused from community meetings. By the end of this meeting, Shepherd had either been terminated from her job or events had been put into motion that would

result in her termination.  Under these circumstances, Plaintiff has stated a prima facie case of

disparate treatment based upon her religion.  Furthermore, Defendant has not pointed to a

legitimate, non-discriminatory reason for its actions and therefore Plaintiff does not bear the

burden of demonstrating that Defendant's reason is a pretext for unlawful discrimination.

Defendant's motion for summary judgment on Plaintiff's disparate treatment claims will be

denied.

### Failure to Accommodate

In a failure to accommodate claim:

> the employee must show: (1) she holds a sincere religious belief that conflicts
> with a job requirement; (2) she informed her employer of the conflict; and (3) she
> was disciplined for failing to comply with the conflicting requirement. Once all
> factors are established, the burden shifts to the employer to show either it made a
> good-faith effort to reasonably accommodate the religious belief, or such an
> accommodation would work an undue hardship upon the employer and its
> business.

Webb v. City of Phila., 562 F.3d 256, 259 (3d Cir. 2009) (citing Shelton v. University of

Medicine & Dentistry of NJ, 223 F.3d 220, 224 (3d Cir. 2000)).  Defendant challenges Plaintiff's

sincerely held religious belief and argues that she proposed only unreasonable accommodations.

### Sincerely Held Religious Belief

The Court of Appeals has explained that:

> Title VII does require the EEOC or the courts to evaluate a plaintiff's claimed
> entitlement to accommodation of her religious principles. But all the government
> must do is ascertain whether the employee's belief is religious and is sincerely
> held, just as the government does in ruling on conscientious objector applications.
> While courts may not inquire into the verity of a religious belief, "it is entirely
> appropriate, indeed necessary, for a court to engage in analysis of the sincerity of
> someone's religious beliefs in both the free exercise context, and the Title VII
> context."

Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 136-37 (3d Cir. 1986) (citations omitted)

(quoting Philbrook v. Ansonia Bd. of Ed., 757 F.2d 476, 481 (2d Cir. 1985), aff'd, 479 U.S. 60

(1986)).  Moreover:

> The breadth of the "exemption" afforded by Title VII is underscored by the fact that in defining religion, the EEOC has used the same broad definition as the Selective Service employs for conscientious objector purposes. In the Selective Service context, the Supreme Court has held that to qualify as religious, a belief need not be a traditional faith, or be based on a Supreme Being; a religious belief may be one that is "purely moral and ethical in source and content but that nevertheless imposes upon [its holder] a duty of conscience...."

Id. at 136 n.4 (quoting Welsh v. United States, 398 U.S. 333, 340 (1970) (other citations omitted).  Whether a belief is a protected religious belief under Title VII does not depend on whether it is "acceptable, logical, consistent, or comprehensible to others…."  Thomas v. Review Bd. of the Indiana Employment Sec. Div., 450 U.S. 707, 714 (1981). "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."  Hernandez v. Comm'r, 490 U.S. 680, 699 (1989).  See also 29 C.F.R. § 1605.1 (EEOC definition of "religious" nature of a practice or belief includes "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views" and the fact that no religious group espouses such beliefs will not determine whether the belief is a religious belief).  Therefore, a court's inquiry into whether a belief is "religious" is limited to determining whether the belief is (1) "sincerely held" and (2) religious within the plaintiff's "own scheme of things."  Welsh, 398 U.S. at 339 (quoting United States v. Seegar, 380 U.S. 163, 185 (1969)).

Defendant challenges the sincerity of Plaintiff's religious beliefs, citing Sidelinger v. Harbor Creek School District, 2006 WL 3455073 (W.D. Pa. Nov. 29, 2006).  In that case, Judge Cohill determined, after a bench trial, that the plaintiff, a teacher, did not establish that his refusal to wear an photo ID badge as the school district directed was based upon a sincerely held religious belief.  The court did not make this finding based on the fact that his belief could not be

identified with his stated religion or a religious tenet, but rather based on the teacher's testimony, which the court found not to be credible. Specifically, the court noted that: 1) Sidelinger misrepresented what the superintendent said to him at a meeting to discuss the issue (which Sidelinger recorded); 2) although offered many opportunities to explain what he meant by vaguely saying that wearing an ID badge constituted "pride" or "hypocrisy," he refused to do so; and 3) he posted his photo on two Internet dating websites after his termination and he could not explain the discrepancy. Id. at *13-15.

In this case, by contrast, the Court is considering a motion for summary judgment, not a bench trial, and Plaintiff's credibility cannot be assessed. See E.E.O.C. v. Aldi, Inc., 2008 WL 859249, at *6 (W.D. Pa. Mar. 28, 2008) ("the sincerity of Plaintiff's belief that it is a sin to work on Sundays turns on the fact-finder's determination of her credibility.") See also Davis v. Fort Bend County, 765 F.3d 480, 485-86 (5th Cir. 2014) (noting that "the plaintiff's 'sincerity' in espousing that practice is largely a matter of individual credibility.");[16] E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 56 (1st Cir. 2002) (noting that Title VII "leaves little room for a party to challenge the religious nature of an employee's professed beliefs."); Tagore v. United States, 735 F.3d 324, 328 (5th Cir. 2013) (when district court held on summary judgment that Sikh employee failed to demonstrate that her sincerely held religious beliefs required her to wear a sword with a 3-inch blade, rather than the statutorily acceptable 2.5-inch blade, the court of appeals concluded that "this is slicing too thin.").

More significantly, Defendant appears to be drawing the Court into a discussion of

---

[16] In Davis, the court reversed the district court's holding that Davis's reason for not working on a particular Sunday—breaking ground for a new church and feeding the community—was not a religious belief or practice because she did so at the request of her pastor rather than as a religious requirement.

whether refusing to attend community meetings and state a goal related to one of the seven

commitments of the Sanctuary Model is a tenet of Jehovah's Witnesses belief, which is not

permissible.  See Frazee v. Illinois Dept. of Employment Sec., 489 U.S. 829 (1989) (holding that

a plaintiff's "sincerely-held belief" that he should not work on "the Lord's Day" entitled him to

protection of the Free Exercise Clause of the First Amendment despite his nonmembership in

any religious sect).  Nor can Gannondale argue that Plaintiff is misreading the tenets of her

Jehovah's Witness faith, because "Courts are not arbiters of scriptural interpretation."  Thomas,

450 U.S. at 716.

A number of courts have explicitly recognized the sincerely held beliefs of Jehovah's

Witnesses.  See Telfair v. Federal Express Corp., 934 F. Supp. 2d 1368, 1382 (S.D. Fla. 2013)

(court would not inquire into whether formal Jehovah's Witness doctrine actually required that

members or elders participate in Saturday field ministry or Bible study as opposed to simply

encouraging these practices), aff'd mem., 567 F. App'x 681 (11th Cir. 2014); Matos, 2005 WL

2656675, at *4 (Jehovah's Witness did not have to establish that attending assembly was a tenet

of her faith and the fact that she attended it for four years and quit her job rather than miss it was

more than enough to demonstrate the sincerity of her religious belief); Velez-Sotomayor v.

Progreso Cash and Carry, Inc., 279 F. Supp. 2d 65, 75 (D.P.R. 2003) (employer was not entitled

to summary judgment based on argument that Jehovah's Witness's refusal to wear a Santa Claus

hat did not really conflict with her religious belief of not celebrating Christmas); Kentucky

Comm'n on Human Rights v. Lesco Mfg. & Design Co., 736 S.W.2d 361 (Ky. App. 1987)

(Jehovah's Witness secretary who refused to answer the phone with "Merry Christmas" based

upon religious beliefs was discriminated against).

Defendant argues that requiring employees to attend community meetings and state goals

relating to the seven commitments of the Sanctuary Model could not have conflicted with Plaintiff's religious belief about "the end of days" because the goals and "change" discussed at the meetings did not have anything to do with these cosmic questions. This is a flawed argument because it measures the religious validity of Plaintiff's objection to the community meetings based on Gannondale's "scheme of things" rather than hers. See Ambrose v. Gabay Ent & Assocs., P.C., 2013 WL 4195387, at *4 (E.D. Pa. Aug. 15, 2013) (rejecting employer's arguments that plaintiff who refused to wear badge with the phrase "Our Ten Commandments" on the back could not have held a religious belief that conflicted with this requirement because employer intended the words "Ten Commandments" to be understood in their "vernacular sense" and because the rules on the badge did not discuss religion). Plaintiff has stated a prima facie case of failure to accommodate.

Reasonable Accommodation/Undue Hardship

In the alternative, Gannondale argues that it is entitled to summary judgment on the ground that it could not allow Shepherd to be excused from attending community meetings as a reasonable accommodation because "Gannondale could not grant her a blanket exception from participating in an essential part of the Sanctuary Model's implementation process without damaging the process throughout the institution and undermining the Sanctuary Model itself." (ECF No. 20 at 11.) It is not clear from this sentence and the remainder of Defendant's brief whether it is contending that: a) Plaintiff's request could not be accommodated because allowing even one person to be exempted from community meetings would undermine the Sanctuary Model's "whole culture" approach; or that b) Plaintiff was requesting not just to be excused from community meetings but for Gannondale to abandon the Sanctuary Model entirely. In either event, the argument is unavailing.

There is no evidence that Plaintiff sought to have Gannondale abandon the Sanctuary Model or that one employee would expect such a request to be honored. She testified that she did not seek to have Gannondale abandon the Sanctuary Model (Shepherd Dep. at 46:11-47:16, 105:23-106:2), and there is no evidence to the contrary. Thus, this argument appears to be a red herring and will not be discussed further.

With respect to the other possibility, even accepting Gannondale's explanation that Plaintiff could not be accommodated because she refused to consider any accommodation other than her proposal that she be excused from attending community meetings (the record is disputed on this point), such an argument misconstrues Title VII. "An employee's 'concomitant duty' to cooperate … arises only <u>after</u> the employer has suggested a possible accommodation." <u>Heller v. EBB Auto Co.</u>, 8 F.3d 1433, 1440 (9th Cir. 1993). In <u>Heller</u>, an employee requested time off to attend his wife's conversion ceremony and after it was granted, a supervisor revoked it and when he did not appear for work he was terminated. The employer tried to argue that, after these events, it attempted to call him at home and discuss the situation, but the court rejected this argument because it never offered an accommodation before it fired him. <u>See also</u> 29 C.F.R. § 1605.2(c)(1) ("After an employee … notifies the employer … of his or need for a religious accommodation, the employer … has an obligation to reasonably accommodate the individual's religious practices.")

Defendant has cited no evidence that it suggested a possible accommodation and certainly not before the meeting which resulted in the conclusion that Shepherd would no longer be employed at Gannondale. Rather, the record reflects that Sabol kept insisting that Shepherd had failed to "demonstrate" the conflict between her religious beliefs and attending community meetings, so she offered no accommodation. Nor did Sabol offer any accommodation in

31

response to Plaintiff's request to be excused from the meetings, such as saying that she did not have to tie her goal to a commitment.

On the other hand, Defendant argues that, according to Plaintiff's testimony, it did offer reasonable accommodations: Yaple told her that she could come to community meetings and not participate and that employees were no longer asked to tie their goals to the seven commitments. This argument is flawed for a variety of reasons. First, Defendant is misrepresenting Plaintiff's testimony—she testified that Yaple told her she "could just come to the meetings" and Defendant's counsel assumed this meant Yaple was saying that Shepherd did not have to say anything, but her subsequent testimony about Yaple telling her to "suck it up" makes clear that she did not mean that. On the contrary, the record contains many references to the fact that Gannondale expected employees to attend the community meetings and participate in them.

Second, Yaple claimed to have no recollection of <u>any</u> discussions with Shepherd after the May 23, 2013 meeting. Third, even if Yaple said that Shepherd did not have to tie her goals to a commitment, this alleged statement was made after Shepherd had been told she would no longer be employed by Gannondale, after Gannondale announced her departure and after it posted her position. Such an offer, assuming it was made, could not constitute a reasonable accommodation. <u>See</u> <u>Heller</u>, 8 F.3d at 1440.

Moreover, Plaintiff has stated that Sabol made it clear that she was Shepherd's supervisor, not Yaple, when told that Yaple had previously indicated that Shepherd did not have to attend community meetings if they conflicted with her religious beliefs. Yaple's alleged offers of accommodation would conflict with Sabol's response to Plaintiff's requests and thus a credibility issue would be presented that the jury would have to resolve.

Defendant argues that it could not offer a reasonable accommodation by allowing even

one employee to be excused from community meetings based on a sincerely held religious belief because this would undermine the Sanctuary Model's "whole culture" approach. (Sabol Decl. ¶ 36.) As Plaintiff observes, this appears to be an undue hardship argument couched in terms of reasonable accommodation. In any event, the testimony in this case demonstrates that 100% compliance was never achieved, that people missed community meetings frequently and that it was only after several months and Plaintiff explicitly telling Sabol about her difficulties with community meetings before the topic was even discussed. Even Sabol admitted that Plaintiff had not been attending community meetings for four months before she said anything. (Sabol Dep. at 53:7-10.) Thus, there are disputed issues of fact as to whether excusing Plaintiff from community meetings would have subjected Gannondale to an undue hardship.

The Supreme Court has explained that a reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practices." Philbrook, 479 U.S. at 70. "An 'undue hardship' is one that results in more than a de minimis cost to the employer." GEO Group, 616 F.3d at 273. "Both economic and non-economic costs can pose an undue hardship upon employers; the latter category includes, for example, violations of the seniority provision of a collective bargaining agreement and the threat of possible criminal sanctions." Webb, 562 F.3d at 260 (citations omitted). In determining whether this burden is met, the court should "focus on the specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship." Id.

In this case, there are no economic costs and Defendant appears to be invoking a sort of "esprit de corps" argument that has never been applied outside the context of the military and the police force. See Webb, 562 F.3d at 258 (police department could argue that allowing officers to wear religious garb would undermine esprit de corps and cause the department to suffer undue

hardship); <u>GEO Group</u>, 616 F.3d at 290 (Tashima, J., dissenting) (there was no evidence that being a prison guard requires the same level of cohesiveness and esprit de corps of a paramilitary organization such as the police).

No doubt every employer would argue that allowing even one employee to be excused from an organization-wide practice would undermine that practice as a whole and might encourage other employees to seek exemptions. Nevertheless, Title VII requires reasonable accommodation of employees' sincerely held religious beliefs unless an employer demonstrates that such accommodation would subject it to an undue hardship. <u>See</u> 29 C.F.R. § 1605.2(c)(1) ("A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship.") Defendant's argument would allow the undue hardship exception to swallow the rule of religious accommodation and it is rejected. With respect to Plaintiff's failure to accommodate claim, the motion for summary judgment will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


SHARON L. SHEPHERD, )
                    Plaintiff, )
                     )
    vs. )          Civil Action No. 1:14-cv-8
                     )
GANNONDALE, )
              Defendant. )

<u>ORDER</u>

AND NOW, this 22nd day of December, 2014,

IT IS HEREBY ORDERED that the motion for summary judgment filed on behalf of the

Defendant, Gannondale (ECF No. 18), is denied.



                      <u>s/Robert C. Mitchell       </u>
                      ROBERT C. MITCHELL
                      United States Magistrate Judge